# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA | : | | |
| | : | | |
| v. | : | Case No.: | 21-mj-565 (ZMF) |
| | : | | |
| JEFFREY SCOTT BROWN, | : | Re Document No.: | 6 |
| | : | | |
| Defendant. | : | | |

## MEMORANDUM OPINION

### GRANTING GOVERNMENT'S MOTION TO REVOKE RELEASE ORDER

## I.  INTRODUCTION

Defendant Jeffrey Brown was one of the hundreds of people who stormed the Capitol to stop Congress from certifying the results of the 2020 presidential election.  Multiple videos show him pushing through the mob to confront law enforcement officers who were attempting to keep rioters from entering the Capitol.  One video depicts Brown brandishing a black cannister toward a line of law enforcement officers.  Another video shows a rioter who is almost certainly Brown deploying pepper spray against officers from the same cannister.  Following Brown's arrest in California, a magistrate judge ordered his release pending trial.  The Government now requests the revocation of that order.

## II.  BACKGROUND

The day before the riot at the Capitol, Brown sent a picture of himself boarding a plane to a group chat on an encrypted messaging app.  Crim. Compl. at 2, ECF No. 1.  The group was called "The California Patriots- DC Brigade."  *Id.*  Its description read: "This group will serve as the Comms for able bodied individuals that are going to DC on Jan 6.  Many of us have not met before and we are all ready and willing to fight.  We will come together for this moment that we

are called upon." *Id.*  Brown captioned his picture "Boarding LAX." *Id.*  Flight records confirm that Brown was flying from Los Angeles to Washington, D.C. *Id.* at 3.

Several videos from security cameras and rioters' cell phones depict Brown at the Capitol on January 6.  Security camera footage shows a man wearing a distinctive black and cream fleece hat with a circular logo in the center entering a tunnel near the lower west terrace of the Capitol. *See* Gov't Ex. 5, at 00:35.  A witness who has known Brown for about four or five years identified the man with the hat as Brown.  Crim. Compl. at 3.  The tunnel entrance was packed with rioters. *See, e.g.*, Gov't Ex. 5, at 00:35.  At the other end of the tunnel was a defensive line of law enforcement officers who were trying to prevent rioters from entering the Capitol.  Crim. Compl. at 6.

After pushing against the officers' line with the crowd, Brown asks another rioter in the crowd for a black canister. *See* Gov't Ex. 6, at 01:50–53.  Brown fiddles with the canister for a moment and appears confused as to why nothing is happening, then hands it back to the other rioter, who adjusts it. *See id.* at 02:53–03:05.  Brown takes the canister back, shakes it briefly, and points at a line of law enforcement officers before disappearing below the frame and toward the officers. *See id.* at 03:08–18.  Wearing a scowl and continuing to point the canister in the officers' direction, Brown goes in and out of the frame a few times. *See id.* at 03:13–42.



*Screenshot of Brown from the Capitol Security Camera Footage*

A video shot on another rioter's phone appears to show Brown deploying pepper spray against the officers. *See* Gov't Ex. 3, at 20:04–07. Brown's face is not in the frame, but several clues indicate that he was the one behind the spray. The rioter who sprays the officers is wearing a black coat with long sleeves and holds the pepper spray in his right hand without a glove. *See id.* In the security camera footage, Brown is wearing a black coat with long sleeves and holding a canister in his bare right hand. *See* Gov't Ex. 6, at 03:08–42. No one else appears to be holding any kind of cannister. *See id.* The cell phone video also shows the pepper spray canister as being long and mostly black—except for a thick silver band around the top third of the cannister—with a loop of some kind on the opposite side of the spray nozzle. *See* Gov't Ex. 3, at 20:04–07. Those distinguishing characteristics are likewise found on the cannister that Brown obtained from his fellow rioter. *See* Gov't Ex. 6, at 02:48–03:18. Finally, the sequence of events depicted in both videos places Brown at the time and the place the spraying occurred. The security footage shows a riot shield moving through the crowd toward the line of officers at the same time Brown is moving in and out of frame while pointing a cannister at the officers. *See* Gov't Ex. 6, at 03:30–42. Soon after the riot shield reaches the line of officers, the crowd of rioters engages in concerted pushing, pressing against the officers and laying off in unison. *See*

*id.* at 03:48–04:20.  In the cell phone video, the spraying is followed immediately by a glimpse of a riot shield coming from the crowd toward the line of officers.  *See* Gov't Ex. 3, at 20:05–08. Within seconds, the rioters begin pushing against the officers, shouting what sounds like "heave-ho" as they move back and forth together.  *See id.* at 20:20–21:05.  Brown is visible in several frames near the line between the officers and the rioters.  *See id.* at 20:46, 21:01–03.



*Cell Phone Video Screenshot of a Rioter Pepper Spraying Law Enforcement Officers*

The Government charged Brown with four offenses: assaulting, resisting, or impeding federal officers using a dangerous weapon in violation of 18 U.S.C. § 111(a)(1), (b); obstructing law enforcement during a civil disorder in violation of 18 U.S.C. § 231(a)(3); entering a restricted building or grounds and engaging in disorderly and violent conduct in violation of 18 U.S.C. § 1752(a)(1), (2), (4); and engaging in disruptive, obstructive, and violent conduct at the Capitol in violation of 40 U.S.C. § 5104(e)(2)(D), (E), (F).  *See* Crim. Compl.

Federal agents arrested Brown at his home in Southern California.  A subsequent search of his home and car uncovered a variety of weapons: multiple cans of pepper spray, a taser, a machete, a baseball bat with the words "Tire Striker" on the side, and a bow with arrows.  Gov't Ex. 4; Gov't Mot. at 13.  The search also produced a receipt for bear spray, ammunition, and zip ties.  Gov't Mot. at 13.

A magistrate judge of the Central District of California ordered Brown's release pending trial. *See* Def.'s Opp'n to Gov't Bail Appeal ("Def.'s Opp'n"), Ex. A, ECF No. 8.[1]  The Government moved to stay and appeal the release order. *See* Gov't Mot. for Emergency Stay and for Review of Release Order ("Gov't Mot."), ECF No. 6.  Before this Court could rule on the Government's motion, however, Brown was released. *See* Min. Order (Aug. 27, 2021).  The Court thus denied the motion to stay the order as moot. *Id.*  It held a hearing on the motion to appeal the release order earlier this week. *See id.*; Notice of Hearing (Aug. 27, 2021).[2]

After reviewing the evidence and the parties' briefing, the Court determines that Brown's release poses a threat to public safety.  It revokes the magistrate judge's release order and orders Brown to be detained pending trial.

### III.  LEGAL STANDARD

When a magistrate judge releases a defendant pending trial, "the Government may file, with the court having original jurisdiction over the offense, a motion for revocation of the order." 18 U.S.C. § 3145(a).  The D.C. Circuit has "not squarely decided" what the standard of review should be for such proceedings. *See United States v. Munchel*, 991 F.3d 1273, 1280 (D.C. Cir. 2021).  But every circuit to address the issue has held that a district court's review of a magistrate's detention order is *de novo. See United States v. Chrestman*, --- F. Supp. 3d ----, 2021 WL 765662, at *5 & n.5 (D.D.C. 2021) (collecting cases).  Neither party argues otherwise. Accordingly, the Court will review the order releasing Brown without deferring to the magistrate

---

[1] Neither party produced a transcript of the detention hearing proceedings, so the Court knows little about the magistrate judge's reasoning.  The Court has a physical copy of a pretrial services report that summarizes an interview with Brown and verifies some of his responses with his girlfriend.  That report does not appear on the docket.

[2] Because the hearing on the Government's motion occurred so recently, a transcript is not yet available.

judge's findings.  *See* Local Crim. R. 59.3(b) (providing for "de novo review by the Chief Judge" of any order issued by a magistrate judge in an unassigned criminal case, including pretrial detention or release orders).

## IV.  ANALYSIS

The Bail Reform Act permits the detention of a defendant awaiting trial only in "carefully defined circumstances."  *United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987).  For a defendant to qualify for pretrial detention, his case must "involve[]" an offense that falls into one of five enumerated categories, 18 U.S.C. § 3142(f)(1), or pose a serious risk of flight or of trying to obstruct justice or threaten, injure, or intimidate a witness or juror, *id.* § 3142(f)(2)(A)–(B). The court "shall order the detention" of a qualifying defendant if it "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  *Id.* § 3142(e)(1).  In other words, the court must ask "whether the defendant is a 'flight risk' or a 'danger to the community.'"  *United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019).

Brown is eligible for pretrial detention.  One kind of offense that qualifies a defendant for pretrial detention is a crime of violence.  18 U.S.C. § 3142(f)(1)(A).  A crime of violence includes "an offense that has as an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another."  *Id.* § 3156(a)(4)(A).  Brown is charged with assaulting, resisting, or impeding federal officers using a dangerous weapon in violation of 18 U.S.C. § 111(b).  *See* Crim. Compl.  Because that offense is "categorically a crime of violence," Brown is eligible for pretrial detention.  *See United States v. Quaglin*, 851 F.

App'x 218 (D.C. Cir. 2021); *see also United States v. Klein*, --- F. Supp. 3d ----, 2021 WL
1377128, at *5–7 (D.D.C. 2021).  He does not dispute his eligibility.[3]

The more difficult question is whether the Bail Reform Act demands Brown's detention
due to his risk of flight or dangerousness.  The Government does not argue that Brown poses a
flight risk, so the Court focuses on the latter ground for pretrial detention.  *See* Gov't Mot. at 16.
To justify holding Brown on account of his dangerousness, the Government "must prove by
'clear and convincing evidence' that 'no condition or combination of conditions will reasonably
assure the safety of any other person and the community.'"  *Munchel*, 991 F.3d at 1280 (quoting
18 U.S.C. § 3142(f)).  Assessing whether the Government has made that showing requires
consideration of four factors: (1) "the nature and circumstances of the offense charged," (2) "the
weight of the evidence against the person," (3) "the history and characteristics of the person,"
and (4) "the nature and seriousness of the danger to any person or the community that would be
posed by the person's release."  18 U.S.C. § 3142(g)(1).  The inquiry is an individualized one.
Brown should be detained pending trial only if his "history, characteristics, and alleged criminal
conduct make clear that he . . . poses a concrete, prospective threat to public safety."  *Munchel*,
991 F.3d at 1280.  The Court concludes that Brown poses such a threat.

---

[3] In less-than-clear briefing, the Government also suggests that Brown would be eligible
even if his case did not involve a crime of violence because he used pepper spray.  *See* Gov't
Mot. at 15.  It points to an enumerated offense category that includes "any felony that is not
otherwise a crime of violence . . . that involves the possession or use of a firearm or destructive
device . . . or any other dangerous weapon."  18 U.S.C. § 3142(f)(1)(E).  Neither party discusses
whether pepper spray is a "dangerous weapon."  *Cf. United States v. Worrell*, 848 F. App'x 5
(D.C. Cir. 2021) (holding that district court did not plainly err in finding that pepper spray was
not a dangerous weapon).  In any case, the Court does not need to decide the question because
Brown is eligible on the crime of violence ground.

### A.  Nature and Circumstances of Brown's Charged Offenses

To begin, Brown is charged with extremely serious crimes.  Even though not all the rioters who stormed the Capitol on January 6 should be detained pending trial, Brown was among those "who actually assaulted police officers" and attempted to "br[eak] through" police lines to enter the Capitol.  *See id.* at 1284.  His actions thus place him in "a different category of dangerousness than those who cheered on the violence or entered the Capitol after others cleared the way."  *See id.*

Chief Judge Howell's six considerations for assessing the relative severity of a Capitol rioter's conduct provide a helpful framework for the Court's analysis.  *See Chrestman*, 2021 WL 765662, at *7–9.  Those considerations include whether a defendant: (1) "has been charged with felony or misdemeanor offenses," (2) "engaged in prior planning before arriving at the Capitol," (3) carried or used a dangerous weapon during the riot, (4) "coordinat[ed] with other participants before, during, or after the riot," or (5) "assumed either a formal or a de facto leadership role in the assault by encouraging other rioters' misconduct," and (6) the nature of "the defendant's words and movements during the riot," including whether he "threatened or confronted federal officials or law enforcement."  *Id.* at *7–8.  Balancing those considerations, the Court concludes that the seriousness of Brown's offenses strongly favors detention.

First, Brown is charged with multiple felonies.  *See* Crim. Compl.; *see also* 18 U.S.C. § 111(a), (b); *id.* § 231(a); *id.* § 1752(b)(1).  Felonies are "are by definition more serious than misdemeanor[s]," so "the nature of a felony offense is . . . substantially more likely to weigh in favor of pretrial detention than the nature of a misdemeanor offense."  *Chrestman*, 2021 WL 765662, at *7.  Moreover, at least one of the charges—assaulting, resisting, or impeding federal officers using a dangerous weapon—is a crime of violence, which the Bail Reform Act

specifically instructs courts to account for when evaluating the nature of an offense.  *See* 18

U.S.C. § 3142(g)(1).  The gravity of Brown's charged felonies thus "weighs heavily in favor" of

pretrial detention."  *See United States v. Caldwell*, --- F. Supp. 3d ----, 2021 WL 2036667, at *7

(D.D.C. 2021).

Second, Brown appears to have engaged in some "prior planning before arriving at the

Capitol."  *See Chrestman*, 2021 WL 765662, at *8.  Prior planning "suggests that [a rioter] was

not just caught up in the frenzy of the crowd, but instead came to Washington, D.C. with the

intention of causing mayhem and disrupting the democratic process, mandated under the U.S.

Constitution, of counting and certifying Electoral College votes."  *Id.*  As mentioned, Brown was

part of a group in a messaging app called "The California Patriots- DC Brigade."  Crim. Compl.

at 2.  The group described itself as providing a communications platform for "able bodied

individuals" who were coming to Washington "ready and willing to fight."  *Id.*  Brown's

participation in a group that anticipated violence indicates that he harbored no illusions that his

visit to Washington would be peaceful.  That said, Brown did not bring weapons or tactical gear

from home like some of his fellow rioters did.  *See, e.g.*, *United States v. Gieswein*, No. 21-cr-24,

2021 WL 3168148, at *10 (D.D.C. July 27, 2021).  Perhaps that is only because he traveled by

air and could not get such items through security (after all, a later search of his home and car

uncovered items like pepper spray, a bat, and a machete).  Even if Brown could have come more

prepared, however, he certainly had some idea of what he was getting himself into.

Third, Brown carried pepper spray during the riot and almost certainly used it against law

enforcement.  As detailed above, security camera footage clearly shows Brown brandishing a

cannister toward a line of law enforcement officers.  *See* Gov't Ex. 6, at 02:45–03:42.  Another

video of the same place and time shows a rioter wearing clothing similar to Brown's using a

cannister that looks the same as the one that Brown was handling to deploy spray at the officers. *Compare* Gov't Ex. 3, at 20:04–07, *with* Gov't Ex. 6, at 02:48–03:18.  No one else seems to be holding any kind of cannister.  *See* Gov't Ex. 6, at 03:08–42.  Viewed together, the videos provide clear and convincing evidence that Brown was the one who pepper sprayed the officers. Wielding pepper spray during the riot would be serious by itself; Brown's *use* of pepper spray against law enforcement is even more troubling.  *See Caldwell*, 2021 WL 2036667, at *7.

Fourth, Brown's involvement in "The California Patriots- DC Brigade" group suggests that he coordinated with other riot participants prior to January 6.  "Evidence of coordination with other participants before, during, or after the riot indicates that a defendant acted deliberately to amplify and assure the success of the breach of the Capitol."  *Chrestman*, 2021 WL 765662, at *8.  Nevertheless, there is little evidence of what that coordination looked like. Brown pointed out at oral argument that the Government does not claim he sent any messages in the group chat other than a picture of himself boarding a plane.  *See* Def.'s Opp'n at 4 ("Notably *absent* from the Complaint are any posts made by Mr. Brown urging or suggesting violence, taking back the government by force, etc.").  And although Brown worked with other rioters to breach the Capitol, his "ad hoc, spur-of-the-moment collaboration—while troubling—does not generate nearly the same kind of coordination concerns as other cases."  *See Klein*, 2021 WL 1377128, at *8 (citing contrasting cases in which defendants "arrang[ed] concealed means of communicating by radio during the riot" or led "co-conspirators in deliberate efforts to prevent Capitol Police from closing . . . barriers" (citations omitted)).  Brown's minimal coordinating efforts enhance the gravity of his offense conduct—but only modestly.

Fifth, there is no evidence that Brown "assumed either a formal or a de facto leadership role in the assault by encouraging other rioters' misconduct." *See Chrestman*, 2021 WL 765662, at *8. The Government makes no claim to the contrary.

Sixth and finally, the nature of Brown's conduct during the riot was egregious. He was one of the rioters "who injured, attempted to injure, or threatened to injure others," not one who "merely wandered" the Capitol grounds. *See id.* at *8. He worked his way to the front lines of the conflict with law enforcement officers not only to threaten them—which would be bad enough—but to attack them with pepper spray. *See id.* ("Grave concerns are implicated if a defendant actively threatened or confronted federal officials or law enforcement . . . ."); *see also Quaglin*, 851 F. App'x at 219 (finding significant that the defendant was "on the front line of a group of individuals attempting to violently force their way inside the Capitol by physically overcoming a defensive line of police officers"). Indeed, neither Brown nor the Court could find a case in which a Capitol rioter used pepper spray on law enforcement officers and was released pending trial. *See, e.g.*, *United States v. Khater*, --- F. App'x ----, 2021 WL 3711402, at *1 (D.C. Cir. 2021) (affirming pretrial detention of defendant who pepper sprayed officers); *Quaglin*, 851 F. App'x at 219 (same); *United States v. Worrell*, 848 F. App'x 5, 6 (D.C. Cir. 2021) (same); *Caldwell*, 2021 WL 2036667, at *7, *12 (denying motion to revoke order of pretrial detention by defendant who pepper sprayed officers); *Gieswein*, 2021 WL 3168148, at *11, *18 (same). Brown's behavior during the riot "reflect[s] a contempt for the rule of law and law enforcement, a disturbing disregard for the safety of others, and a willingness to engage in violence." *See Gieswein*, 2021 WL 3168148, at *11; *see also Klein*, 2021 WL 1377128, at *9.

In sum, Brown's conduct was severe even by Capitol rioter standards. The seriousness of his offenses weighs heavily in favor of detaining him pending trial.

### B.  The Weight of the Evidence Against Brown

The evidence against Brown also favors detention.  Multiple videos and photographs—
from security cameras and fellow rioters' cell phones—depict Brown as part of the mob trying to
breach the Capitol.  *See, e.g.*, Gov't Ex. 5, at 00:35 (security camera footage showing Brown
enter a tunnel to the Capitol); Gov't Ex. 2 (cell phone video showing Brown at the front of a
crowd facing off against law enforcement officers).  More than that, videos show Brown
brandishing pepper spray threateningly toward law enforcement officers and spraying them.  *See*
Gov't Ex. 3, at 20:04–07; Gov't Ex. 6, at 02:45–03:42.

There is little disputing that Brown is the one depicted in the videos and photos.  A
witness who had known Brown for four or five years identified him.  *See* Crim. Compl. at 3.
And he was wearing a distinctive black and cream fleece hat with a logo over his forehead that
makes it easy to find him.  *See id.* at 4–5; *cf. Gieswein*, 2021 WL 3168148, at *12 (noting that a
rioter's "distinctive outfit" helped to identify him in video and photographic evidence).  At oral
argument, Brown's lawyer asserted that one could not tell that the person who sprayed the law
enforcement officers was in fact Brown.  For the reasons stated above, the Court disagrees.  *See
supra* section IV.A; *see also supra* Part II.  But even if evidence of Brown's use of pepper spray
was not clear and convincing, the video evidence showing Brown brandishing pepper spray
toward the officers is incontrovertible.  *See* Gov't Ex. 6, at 02:45–03:42.  And Brown's mere
wielding of pepper spray toward officers satisfies the elements of the charged offenses for which
the use of a dangerous weapon is relevant.  *See* 18 U.S.C. § (a)(1), (b) (prohibiting the use of a
dangerous weapon to "forcibly assault[], resist[], oppose[], impede[], intimidate[], or interfere[]
with" federal officers); *id.* § 1752(b)(1)(A) (providing an enhanced penalty for a person who
enters a restricted building or grounds when he "uses or carries a deadly or dangerous weapon");

*see also Gieswein*, 2021 WL 3168148, at *14 ("It is enough [to violate 18 U.S.C. § 111(b)] that [the defendant] forcefully used the chemical spray in a manner that was threatening to a federal officer.").[4]

The evidence against Brown is overwhelming and thus weighs in favor of detention. Nevertheless, it "is the least important" detention factor. *See Klein*, 2021 WL 1377128, at *10 (quoting *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991)).

### C. Brown's Personal History and Characteristics

Brown's personal background and characteristics send mixed signals as to whether release or detention is appropriate. This factor requires a court to take into account the defendant's "character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings." 18 U.S.C. § 3142(g)(3)(A).

Most of those considerations help Brown's case for release. The Central District of California's pretrial services report indicates that Brown has lived in Southern California for most of his 54-year life and continually since 1989. *See* Pretrial Services Report at 2. His mother and brother live in the same area, as does his girlfriend of several years. *See id.* Brown's girlfriend and mother are willing to pay the $100,000 bond the magistrate judge set if he does not appear in court. Def.'s Opp'n at 5; *see also id.* Ex. A. In addition, Brown is a college graduate and has worked as a design consultant for a pavers company for five years. Pretrial Services

---

[4] Notably, Brown concedes that pepper spray is a dangerous weapon. *See* Def.'s Opp'n at 5 ("It is alleged that Mr. Brown possessed and used pepper spray. It is not alleged that Mr. Brown possessed any other dangerous weapon such as a firearm or knife."); *see also Gieswein*, 2021 WL 3168148, at *14 (suggesting that chemical sprays are dangerous weapons).

Report at 3.  He appears financially stable, though he has tax debts in excess of $12,000.  *Id.* at 3.
Brown also has no real criminal history.  His only previous conviction was from when he was in
high school and has since been expunged.  *Id.* at 4; Def.'s Opp'n at 2 n.1.  And although it
appears that Brown may have once had an alcohol abuse problem, he has been sober for the last
five years.  *See* Pretrial Services Report at 4.  He has long used marijuana and continues to do so.
*Id.*  Brown's community and family ties, stable employment, and minimal criminal history are
largely to his credit.

But a recent outburst casts doubt on Brown's assertion that his behavior on January 6 was
an isolated incident.  Cell phone video from customers at a California Costco show Brown
standing on a clothing table in the middle of the store protesting state COVID-19 requirements
using a bullhorn.  *See* Gov't Ex. 7; *Anti-Mask Rant Caught on Camera at Tustin Costco*,
YouTube (Dec. 14, 2020), https://www.youtube.com/watch?v=lSp3Ofwv1_o.  Government
counsel said at oral argument that Brown would not step down or leave until law enforcement
confronted him.  The incident, along with Brown's conduct at the Capitol riot, indicates that
Brown is willing to use disruptive or violent behavior—with little regard for others—to further
his political beliefs.

On top of that, searches of Brown's car and home uncovered a number of weapons:
multiple cans of pepper spray, a taser, a machete, a baseball bat with the words "Tire Striker" on
the side, and a bow with arrows.  Gov't Ex. 4; Gov't Mot. at 13.  The searches also produced a
receipt for bear spray, ammunition, and zip ties.  Gov't Mot. at 13.  Brown claims that he was
packing for a camping trip before his arrest.  Def.'s Opp'n at 7.  And he says that he carries the
taser in his car because his work sometimes requires him to venture into unfamiliar
neighborhoods.  *Id.* at 7.  But his explanations do not add up.  For instance, even though a

camper might reasonably have a receipt for a can of bear spray, that does not explain why Brown has multiple cans of pepper spray too.  Indeed, the label on one of the cans states that the product "is designed to be used by professional law enforcement, military, corrections and security personnel."  Gov't Ex. 4, at 6.  Similarly, the baseball bat's short length and "Tire Striker" name make it doubtful that Brown uses it in a softball league.  *See* Gov't Ex. 4, at 3.

So despite many aspects of Brown's personal background and characteristics indicating that he could live a law-abiding life, recent events raise the concern that he is willing use his political ends to justify extreme means.  And if he acts antisocially again, he certainly has the tools to pose a threat to his community.  Brown's personal characteristics thus weigh in favor of detention.

### D.  The Nature and Seriousness of the Danger Brown's Release Poses

The final factor in assessing dangerousness supports detaining Brown too.  Assessing the "'nature and seriousness of the danger . . . posed by the person's release' . . . encompasses much of the analysis set forth above, but it is broader in scope, requiring an 'open-ended assessment of the seriousness of the risk to public safety.'"  *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *5 (D.D.C. Mar. 10, 2021) (first quoting 18 U.S.C. § 3142(g)(4); and then quoting *United States v. Taylor*, 289 F. Supp. 3d 55, 70 (D.D.C. 2018)).  "Because this factor substantially overlaps with the ultimate question whether any conditions of release 'will reasonably assure . . . the safety of any other person and the community,' it bears heavily on the Court's analysis."  *Id.* (quoting 18 U.S.C. § 3142(e)).

Evidence of Brown's offense conduct and personal history demonstrates that his release would threaten the community.  His actions at the Capitol show that he is willing to use violence—even against law enforcement—to achieve his political aims.  He sought out conflict

15

with law enforcement by making his way to the front lines.  *See Quaglin*, 851 F. App'x at 219; *Caldwell*, 2021 WL 2036667, at *10.  He then assaulted officers with pepper spray.  *See supra* section IV.A.  That egregious conduct "reflect[s] the depth of [his] disregard for the safety of others, for our democratic institutions, and for the rule of law."  *See Chrestman*, 2021 WL 765662, at *15; *see also Khater*, 2021 WL 3711402, at *2 (affirming pretrial detention of a Capitol rioter who used chemical spray against officers largely because "his assault on law enforcement . . . evidence[d] a flagrant disregard of legal authority and disrespect for law enforcement"); *Gieswein*, 2021 WL 3168148, at *16 (explaining that a rioter's intentional deployment of "chemical spray against multiple Capitol Police officers" "evince[d] a clear disregard for the safety of others, and of law enforcement in particular").  As mentioned earlier, neither Brown nor the Court was able to find any case in which a Capitol rioter used pepper spray against law enforcement and was not detained pending trial.

Brown's Costco protest confirms that he is willing to cause mayhem and disrupt order even outside the context of a mob.  He disagreed with his state's COVID protocols, so he made his views known by climbing on a table, yelling at shoppers with a bullhorn, and refusing to cease when store personnel asked him to.  Law enforcement had to put a stop to the protest.  Clearly, Brown is someone who acts on his beliefs.  *Cf. United States v. Sabol*, --- F. Supp. 3d ----, 2021 WL 1405945, at *17 (D.D.C. 2021) (noting that the rioter "did not simply hold . . . misguided beliefs" about "a tyrannical government that 'stole' a presidential election"; "he acted on them").  To be sure, there is no indication that he was violent during his protest.  But the threat posed by a defendant's release "need not be of physical violence" to warrant detention; it "may extend to 'non-physical harms such as corrupting a union.'"  *Munchel*, 991 F.3d at 1283 (quoting *United States v. King*, 849 F.2d 485, 487 n.2 (11th Cir. 1988)).  Brown's refusal to obey

requests from store personnel attests to his apathy toward rules and order.  And though Brown was not violent during his Costco protest, his disruptive conduct was so significant and unabating that it attracted the attention of law enforcement.  That kind of behavior risks conflict.

Between Brown's egregious actions at the Capitol and his protest at Costco, the Court is convinced that releasing him would risk additional inappropriate and disruptive outbursts, combative standoffs, and even violence.  His demonstrated disregard for the safety of others and the rule of law indicates that no combination of pretrial release conditions could reasonably guarantee the safety of the community.  Brown will be detained pending trial.

## V.  CONCLUSION

For the foregoing reasons, the Government's motion to revoke the magistrate judge's release order (ECF No. 6) is **GRANTED**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: September 3, 2021                                  RUDOLPH CONTRERAS
                                                          United States District Judge