**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-178-APM** |
| **JEFFREY SCOTT BROWN,** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Jeffrey Scott Brown to seventy months' incarceration, the midpoint of the Sentencing Guidelines advisory imprisonment range of 63 to 78 months calculated by the United States Probation office and the government, three years of supervised release, $2,000 in restitution, a fine, and the mandatory $100 special assessment for each count of conviction.

## I.    INTRODUCTION

The defendant, Jeffrey Scott Brown, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars' in losses.[1]

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $ 2,881,360.20. That amount reflects, among other things, damage to the

1

Brown, a Santa Ana, California resident, was part of the violent mob in the Lower West Terrace ("LWT") Tunnel (the "LWT Tunnel") of the U.S. Capitol on January 6, 2021.  He had planned for at least several weeks before January 6 to travel to Washington, D.C. to protest the results of the 2020 presidential election.  On December 21, 2020, he appeared on "Info Wars," as a guest, stating that he planned to go to Washington, D.C. on January 6, 2021, and exhorting others to go as well.  Brown posted on Parler, a social media platform, to "[g]et to DC if you can . . . [d]oing nothing is no longer an option."  On January 2, 2021, he joined a Telegram message group called "The California Patriots – DC Brigade."[2]  He sent the group a message with a photo of himself on January 5, 2021, indicating that he was boarding a flight to Washington, D.C. from Los Angeles, California.  The group members sent messages indicating their willingness to fight and discussing the utility of "chili" spray, goggles, and bear spray.

On January 6, Brown attended President Trump's rally and then walked to the Lower West Terrace ("LWT") of the Capitol, arriving before 3:00 p.m. He went inside the LWT Tunnel, where he coordinated with codefendants Peter Schwartz and Markus Maly to spray Metropolitan Police Department officers with pepper spray, as those officers struggled to keep rioters out of the building.  Brown appears to have fallen in with Schwartz and Maly, both of whom have significant criminal histories, without engaging in any prior communication or association.  He remained in the LWT Tunnel for several minutes, working in coordination with those around him by pushing and "heave-ho"-ing[3] against officers.  And after his attack on officers, he remained on what

_____

United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

[2] At least six other members of this group have been charged with conspiracy and other serious crimes related to January 6.  United States v. Alan Hostetter, et al., Case No. 1:21-cr-392-RCL.

[3] Several rioters in the tunnel chanted, "Heave! Ho! Heave! Ho!" coordinating the physical

appeared to be Capitol grounds until dark that day.

The government recommends that the Court sentence Brown to seventy months' incarceration, which is within the advisory Guidelines' range of 63 to 78 months, which the government submits is the correct Guidelines calculation. A 70-month sentence reflects the gravity of Brown's conduct, as well as his background and characteristics.

## II.      FACTUAL BACKGROUND

Paragraphs 20 through 25 of the pre-sentence investigation report briefly and accurately summarize the attack on the United States Capitol on January 6, 2021 by a mob of rioters, including Brown.

The defendant, Jeffrey Brown, lives in Santa Ana, California.  He traveled from California to Washington, D.C. on January 5, 2021, after making multiple statements on various social media regarding his desire to protest the 2020 presidential election and support former President Trump. Once in Washington, D.C., Brown attended the Rally to Save America at the Ellipse and then walked to the U.S. Capitol's LWT, arriving before 3:00 p.m.  Posting on Parler, a social media platform, on January 6 and 7, 2021, he discussed his presence in Washington, D.C., and exhorted people to "[f]ight the corruption":

---

efforts of the mob.



***Figure 1:*** *Screen capture of Parler message attributed to Brown  (Trial Exhibits 301.1 through 301.7)*

At the Capitol, Brown first entered the LWT Tunnel at approximately 2:56 p.m., using his phone to capture the actions of rioters and police officers inside.  *See* Trial Exhibit 103, USCP Video from LWT Tunnel.

4



***Figure 2:*** *Still of USCP surveillance footage (Trial Exhibit 103) showing Brown circled in red*

He continued to enter the LWT Tunnel, and remained while rioters pushed against police officers guarding the entryway to the building, but left after approximately a minute. He was in the LWT Tunnel long enough to see the pushing, rioters holding large objects, and the general chaos.

Brown returned to the LWT Tunnel approximately thirteen minutes later, at around 3:09 p.m. This time, he was close behind codefendant Peter Schwartz as he entered the LWT Tunnel for a second time.



***Figure 3:***  *USCP footage (Trial Exhibit 103) showing Brown (red circle) behind Schwartz (blue)*

Once inside the LWT Tunnel, Brown made his way to the front of the crowd of the rioters, where he was directly in front of the doors leading to the Capitol, and the officers who guarded them.  Schwartz handed an unlabeled canister filled with orange liquid to codefendant Markus Maly, who was inside the LWT Tunnel at the same time.  In turn, Maly handed the canister to Brown, who appeared to struggle to open the canister.  Brown then handed the canister back to Schwartz, who adjusted the canister and handed it back to Brown.  Brown then made his way forward to the front of the line, ultimately spraying an orange liquid directly above the heads of the line of officers.



***Figure 4:*** *Still from Trial Exhibit 115, showing Brown spraying police officers*

While the stream of liquid did not directly hit any officer, its effect was to heighten the danger to the officers in that tunnel.  As Sergeant Phuson Nguyen testified at trial, even though he wasn't hit by that specific stream, it affected him "In one way or another."  Trial Tr. 11/30/22 at 654.  He explained that:

> Because we was [sic] in such a confined space, and you can see that the spray is aiming our direction. Also, that day, the wind was blowing in our direction, and I learned that from the outside when we were still outside before the line broke…. Because the tunnel is an enclosed space with one open end facing westward. And if the wind blow eastward, then everything that being sprayed would come back right at us.

Trial Tr. 11/30/22 at 654.

Brown remained in the LWT Tunnel after spraying at officers and joined in other rioters' efforts to use the combined weight of their bodies to push the officers back.  At least one officer

was trapped in the process.   As Brown and the crowd lunged forward, the crowd yelled, "Heave

Ho" and pushed in unison against the police line.   Seconds later, Officer Daniel Hodges was

crushed inside the tunnel door frame as another rioter pushed a riot shield against Officer Hodges'

body, rendering him unable to move.   *See* Trial Exhibit 115, Open-Source Video from LWT

Tunnel.



*Figure 5: Still from Trial Exhibit 115 depicting Brown (red circle) in LWT tunnel*

After approximately five minutes, Brown exited the LWT Tunnel, but he did not go far.

Even as the sky darkened, it appeared that he remained adjacent to, or on Capitol grounds for hours

that evening.   *See* Trial Tr. 12/2/22 at 891 (FBI Special Agent Salo testifying that "there are

photographs that are publicly available where he is pictured around the Capitol and it is dark

outside").



***Figure 6 & 7:*** *Brown (red circle) captured in media coverage of Jan. 6, 2021 (Trial Exhibit 118.1 and 118.2)*

After January 6, 2021, Brown returned home to California. Even after his arrest in this case, he has not expressed remorse for his actions. On GiveSendGo, an online crowdfunding website, Brown posted a video message as part of the effort to raise money for his legal defense.

*See* Brown PSR ¶97.  In that video, dated May 1, 2022, Brown called himself a "political prisoner" who had been detained "due to political motivations."  He falsely stated that the Capitol police had attacked rioters "unprovoked," and that the police had "initiated" the violence.  He gave "a five-alarm warning to all freedom-loving patriots, they need to get out of their comfort zones, take actions in their communities, and wake all of their neighbors that they can."  *See* Justice for Jeff Jan 6 Patriot GiveSendGo site, https://www.givesendgo.com/G29WR (last visited on April 7, 2023).

### III.  THE CHARGES AND PLEA

On December 6, 2022, Jeffrey Brown was convicted following a jury trial of all the charges against him in the Second Superseding Indictment.  The charges were:

- Count Two, Interfering with Law Enforcement During a Civil Disorder, 18 U.S.C. § 231(a)(3);

- Count Seven, Assaulting, resisting, or impeding certain officers with a deadly or dangerous weapon, 18 U.S.C. § 111(a)(1) and (b)(1);

- Count Nine, Entering or Remaining in a Restricted Building or Grounds with a Dangerous Weapon, 18 U.S.C. § 1752(a)(1) and (b)(1)(A);

- Count Ten, Disorderly or Disruptive Conduct in a Restricted Building or Grounds with a Dangerous Weapon, 18 U.S.C. § 1752(a)(2) and (b)(1)(A);

- Count Eleven, Engaging in Physical Violence in a Restricted Grounds with a Deadly or Dangerous Weapon, 18 U.S.C. § 1752(a)(4) and (b)(1)(A);

- Count Twelve, Disorderly Conduct in a Capitol Building, 40 U.S.C. § 5104(e)(2)(D); and

- Count Thirteen, Act of Physical Violence in the Capitol Grounds, 40 U.S.C. § 5104(e)(2)(F).

### IV.  STATUTORY PENALTIES

Brown now faces sentencing on these charges.  The U.S. Probation Office has correctly

noted the statutory penalties for each.  PSR ¶¶102-105.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The Guidelines calculations in the PSR are correct as far they go, but the PSR does not include certain required calculations. In particular, the PSR does not include a Guidelines analysis for each count of conviction. *See* PSR ¶¶ 41-64. Sections 1B.1(a)(1)-(3) describe the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments. Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count." Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3. The revised PSR does not follow these steps. It concludes (*see* PSR ¶¶ 53-55) that certain counts group—a conclusion with which the government agrees—but does not set forth the Guidelines calculation separated for each count as required under U.S.S.G. § 1B1.1(a)(4). That Guidelines analysis

11

follows:

### Count Two: 18 U.S.C. § 231(a)(3)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[4] | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2) | Dangerous weapon used | +4 |
| U.S.S.G. § 3A1.2(a) | Official Victim | +6 |
| | **Total** | **24** |

### Count Six: 18 U.S.C. § 111(a)(1) and (b)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2) | Dangerous weapon used | +4 |
| U.S.S.G. § 2A2.2(b)(7) | Convicted under 18 U.S.C. § 111(b) | +2 |
| U.S.S.G. § 3A1.2(a) | Official Victim | +6 |
| | **Total** | **26** |

### Count Nine: 18 U.S.C. § 1752(a)(1) and (b)(1)(A)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[5] | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2) | Dangerous weapon used | +4 |
| | **Total** | **18** |

### Count Ten: 18 U.S.C. § 1752(a)(2) and (b)(1)(A)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[6] | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2) | Dangerous weapon used | +4 |
| | **Total** | **18** |

### Count Eleven: 18 U.S.C. § 1752(a)(4) and (b)(1)(A)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2) | Dangerous weapon used | +4 |
| U.S.S.G. § 3A1.2(a) | Official Victim | +6 |

---

[4] By operation of U.S.S.G. § 2X5.1, and cross-reference from § 2A2.4.

[5] By cross-reference from U.S.S.G. § 2B2.3(c)(1), and then through operation of § 2X1.1(a).

[6] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

|  | **Total** | **24** |
|---|---|---|

The PSR correctly notes that Counts 2, 6, and 11 group because they involve the same victim (law enforcement), while Counts 9 and 10 group because they involve the same victim (Congress).  PSR ¶¶50-51.  But then these two groups combine with each other because the calculation for Counts 2, 6, and 11 embodies conduct (dangerous weapon) that is treated as a specific offense characteristic in Counts 9 and 10.  *Id*. ¶52.

| **Combined Offense Level** | **26** |
|---|---|
| **Total Adjusted Offense Level:** | **26** |

The U.S. Probation Office calculated Brown's criminal history as category II, which is not disputed.  PSR ¶ 67.  Accordingly, based on the government's calculation of Brown's total adjusted offense level, Brown's Guidelines imprisonment range is 63 to 78 months' imprisonment.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in

American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each individual person who entered the Capitol and assaulted police officers on January 6 did so under the most extreme of circumstances, to which their conduct directly contributed.

The nature and circumstances of Brown's crimes weigh heavily towards a significant term of incarceration. Brown personally participated in violence that day by entering the LWT Tunnel to spray at and push against police officers. He did so after having had time to reflect after witnessing other rioters doing the same, understanding that these officers were radically outnumbered and attempting to keep rioters from advancing any further into the building. He was in a particularly violent area of the riot, and did not appear to leave the Capitol area until after dark.

Brown's actions on January 6 show an absolute disregard for the rule of law coupled with a willingness to engage in violence.

The seriousness of this offense, including spraying pepper spray at police officers and pushing to the front of the "tunnel" that police officers were guarding demands a lengthy sentence of imprisonment.

### B. Brown's History and Characteristics

Before he was arrested, Brown was a salesman for five years. PSR ¶92. As far as criminal history, it appears limited; he was on supervised probation for two years beginning in 1987 for a burglary charge. *Id*. ¶66. His history and characteristics do not weigh heavily one way or the

other in relation to the question of the length of his term of incarceration.

**C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[7] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Brown's criminal conduct, assaulting a law enforcement officer, is the epitome of disrespect for the law.

When Brown entered the Capitol grounds, it was abundantly clear to him that the law enforcement officers protecting the building were under siege. Law enforcement officers were overwhelmed, outnumbered, and in some cases, in serious danger. The rule of law was not only disrespected; it was under attack that day. A lesser sentence would suggest to the public, in general, and other rioters, specifically, that assaults on police officers are not taken seriously. In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

**D.    The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir.

---

[7] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at
https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

2010).

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[8] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.  There is possibly no greater factor that this Court must consider.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs toward incarceration.  Brown has expressed no acceptance of responsibility or regret for the crimes he committed.  To the contrary – even after arrest and incarceration, he appears to indicate that he is the victim and that he has done nothing wrong, calling himself a "political prisoner."  *See* Justice for Jeff Jan 6 Patriot GiveSendGo site, https://www.givesendgo.com/G29WR (last visited on April 10, 2023).

His continued failure to understand or acknowledge the illegality of his actions counsels in favor of a lengthier term of imprisonment, to ensure that he is deterred from similar conduct in the future.

### E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United*

---

[8] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

*States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

### F.    Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that Brown and others like him committed on January 6 are unprecedented. These crimes defy statutorily appropriate comparisons to other obstructive related conduct in other cases. To try to mechanically compare other § 111 defendants prior to January 6, 2021, would be a disservice to the magnitude of what the riot entailed and signified.

Although the defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.  While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

For example, in *United States v. Daniel Caldwell*, 21-cr-181-CKK, Judge Kollar-Kotelly sentenced defendant Caldwell to 68 months' imprisonment.  Caldwell was also on the LWT, where he sprayed a line of police officers before entering the building through the Senate Wing door.  Although Brown did not enter the building as Caldwell did, Caldwell was convicted of violating U.S.C. § 111(a)(1) and (b) for spraying at police officers, as Brown was.  Like Brown, Caldwell also had no criminal history.   But unlike Brown, Caldwell pleaded guilty and accepted responsibility for his actions.

In *United States v. Julian Khater*, 21-cr-0222, Judge Hogan sentenced defendant Khater to 80 months of incarceration after the defendant and another individual arrived in Washington, D.C. armed with two containers of bear spray, which were never used, and two containers of hand-held pepper spray, one of which Khater ultimately did use as he sprayed several police officers.  Khater observed the raging violence occurring against police officers and he willingly and voluntarily joined that attack, spraying at least three officers at close range on the Lower West Terrace. He aimed his cannister of pepper spray towards the officers who were distracted by the group effort to remove a barricade.  Khater held his right arm up high in the air and began spraying the smaller, hand-held cannister of pepper spray at any officer he could find.  Like Brown, Khater sprayed pepper spray at police, and joined the mob in attacking police, but Khater sprayed at police more than once and brought sprays with him to Washington, D.C.  Both Brown and Khater had minimal criminal histories, although Khater's sentence reflects bodily injury to an officer and multiple assaults.  These differences and similarities are reflected in the lower sentencing recommendation for Brown.

In *United States v. Shelly Stallings*, Case No. 21-cr-178-4, this Court sentenced defendant

Stallings to 24 months' imprisonment.  Like Brown, Stallings sprayed at police officers one time on the LWT.  Stallings, however, pleaded guilty and accepted responsibility; in addition, this Court recognized that Stallings's health and relationship with a codefendant were unique factors in considering her sentence.  These factors resulted in Stallings' period of incarceration being the shortest of any of the approximately fifteen defendants with January 6-related conduct sentenced so far for violations of 18 U.S.C. § 111(a)(1) and (b).  These additional factors do not exist with Brown, and his sentence should reflect such differences and remain within the sentencing guidelines.

## VII.    RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Two general restitution statutes provide such authority. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096. Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under

the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.[9]

Because this case involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), *see* 18 U.S.C. § 3664(f)(1)(A)(requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each

---

[9] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses, 18 U.S.C. § 3664(h). That latter approach is appropriate here.

More specifically, the Court should require Brown to pay $2,000 in restitution for his convictions on the felony counts of the indictment. This amount fairly reflects Brown's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   FINE

Brown's convictions subject him to a statutory maximum fine of $250,000.  *See* 18 U.S.C. § 3571(b)(3).  In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources.  *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d).  In assessing a defendant's income and earning capacity, a sentencing court properly considers whether a defendant can or has sought to "capitalize" on a crime that "intrigue[s]" the "American public."  *United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994).

A fine may be appropriate in this case. As the PSR notes, Brown has raised over $25,000 in an online campaign for "Justice for Jeff January 6 Patriot," in which funds will be "received by Jeffrey Brown."  PSR ¶97.  The website indicates the funds are to be used for his legal defense. *Id.*  However, after setting aside any costs directly attributable to legal fees, a fine should be

21

imposed for the remainder, as Brown should not be able to "capitalize" on his participation in the Capitol breach in this way.

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 70 months, which is a mid-range sentence as calculated by the government and U.S. Probation, restitution of $2,000, a fine, and the mandatory $100 special assessment for each count of conviction.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
DC Bar No. 481052

By:_____/s/_____
     Cindy J. Cho
     Assistant United States Attorney
     Member of NY Bar
     U.S. Attorney's Office for the District of Columbia
     601 D Street NW
     Washington, D.C. 20530
     Phone: 317-229-2425
     Email: Cindy.Cho@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 17, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to all parties listed on the Electronic Case Filing System.

By:   <u>/s/ Cindy J. Cho</u>
CINDY J. CHO
Assistant United States Attorney