UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | Case No. 1:21-cr-00178-APM-2 |
| | : | |
| JEFFREY SCOTT BROWN | : | Honorable Judge Amit P. Mehta |
| *Defendant.* | : | |
| | : | |

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING
AND ASSESSMENT OF 18 U.S.C. § 3553(a) SENTENCING FACTORS AND
MOTION FOR VARIANCE**

COMES NOW, Jeffrey Brown, by and through counsel, and provides the Court with his position regarding the application of the sentencing factors to the Court's obligation to impose a sentence "sufficient, but not greater than necessary to comply" with the factors found in 18 U.S.C. § 3553(a). Mr. Brown respectfully requests a downward variance from the sentencing guidelines and a sentence of no more than forty months' incarceration for the reasons set forth herein.

Mr. Brown is aware of the seriousness of the events of January 6, 2021, and that of the larger collective who gathered in protest that day. It was a protest that ultimately turned violent and destructive; destructive to individual victims, and destructive to the broader democratic process of which Mr. Brown was there to peacefully participate. While respectfully disagreeing with the jury's verdict—for the reasons argued at trial—Mr. Brown takes responsibility for his presence that day. He seeks a path forward through punishment and rehabilitation that will allow him to return as a contributing member of his community.

## Background

On December 6, 2022, a jury found Mr. Brown guilty of (i) Civil Disorder under 18 U.S.C. § 231(a)(3); (ii) Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous

Weapon under 18 U.S.C. §§ 111(a)(1) and (b); (iii) Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon under 18 U.S.C. §§1752(a)(1) and (b)(1)(A); (iv) Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon under 18 U.S.C. §§1752(a)(4) and (b)(1)(A); (v) Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon under 18 U.S.C. §§1752(a)(2) and (b)(1)(A); (vi) Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon under18 U.S.C. §§1752(a)(4) and (b)(1)(A); Disorderly Conduct on Capitol Grounds or Buildings under 40 U.S.C. § 5104(e)(2)(D); and (vii) Act of Physical Violence in the Capitol Grounds or Buildings under 40 U.S.C. § 5104(e)(2)(F).

Mr. Brown is a fifty-six-year-old man with no relevant criminal history. The PSR reflects only a high school prank gone wrong from when he was a high school senior. *See* PSR ¶ 66. He is a loving and devoted son and beloved friend to many. From his young days as an Eagle Scout (PSR ¶ 76) to his recent years as care-taker family member and friend, his life is marked by service and dedication to others. *See generally* Exhibit 1, letters from family and friends. He is neither a life-long criminal, nor a long-term partisan zealot, as many seek to portray him; rather, he is just a man trying to earn a living, help those around him, and stand up for broader democratic principles that he values.

Mr. Brown traveled to Washington for President Trump's speech on January 6. While traveling to the event was something of an afterthought for Mr. Brown, he was excited, as it would offer him an opportunity to meaningfully exercise his First Amendment rights in peaceful support of political matters that were important to him. He did not bring a weapon or other

instrumentality of battle, he did not substantially coordinate with any groups, and he did not encourage others to violate the law.

The charged conduct revolves around less than 10 minutes of Mr. Brown's life, and the Government's claim that Mr. Brown sprayed pepper spray toward law enforcement. While this claim—and whether any spray amounted to a deadly or dangerous weapon—is in dispute, Mr. Brown readily admits that he should never have been in the tunnel that day; one look inside should have cautioned him away. But he did go in, and he takes responsibility for this decision and any harm that it allowed to occur. But that is his offense, and significantly the Government appears to concede that Mr. Brown's alleged spray did not make contact with any specific victim.

Mr. Brown has been arrested, released, surrendered, moved between facilities frequently, released again, confined, and moved again—throughout, he has complied with every order and instruction from the Court and his respective facility.

But what's more, he has not simply languished in self-pity and recrimination. True to his character, he has repeatedly been entrusted as a trustee by various facilities. He has worked consistently, dedicated to serving his fellow inmates and helping staff. Despite the fact that he has moved through at least 5 different facilities, he has served over 90,000 meals during his incarceration. *See* Exhibit 1, letter from Kathy Gaughran. It has been exhausting, but Mr. Brown finds it rewarding to be productive and contributing even while in incarceration, rather than complacent and a burden. This is representative of his character, and his rehabilitative potential.

Mr. Brown lives with regret that he was there that day, let alone in the tunnel where so much pain was inflicted. In the course of reviewing discovery and reviewing public coverage, he

is well aware of the physical and emotional trauma this day inflicted on members of law enforcement—and helpless members of the protest—and he expresses nothing by regret and sympathy.  Mr. Brown knows that he should never have entered the tunnel upon seeing the tumult inside.  It is something he lives with every day, while confined and removed from his family, friends, and society.

As demonstrated by Mr. Brown's life history, the attached letters from family and friends, and his actions since arrest, Mr. Brown's character will ensure that he fulfills the obligations that the Court and probation imposes on him.  This commitment should be both encouraged and fostered through a sentence that appropriately balances punishment, deterrence, and rehabilitation.

## Sentencing Guidelines

While Defendant disputes the state of the Government's evidence presented at trial and objects to the Jury's verdict on all Counts, the Presentence Report ("PSR") correctly calculates his sentencing guidelines based on that verdict.  The base-level offense for a violation of 18 U.S.C. § 111(a)(1) is 14 (United States Sentencing Commission, Guidelines Manual ("USSG") § 2A2.2(a)); four levels are added for a "dangerous weapon" (USSG § 2A2.2(b)(3)(B)); and six levels are added because of the risk and status of any victim (USSG § 2A2.2(b)(7)).

This adds up to a Total Offense Level of 26.  Mr. Brown has a total criminal history score of zero, which establishes a criminal history category of I.  The guidelines imprisonment range is 63 months to 78 months.

**Argument**

A. **The Court shall impose a sentence sufficient, but not greater than necessary, to comply with 18 U.S.C. § 3553(a).**

"The court shall impose a sentence sufficient, but not greater than necessary, to comply with" 18 U.S.C. § 3553(a)'s mandates. These include considering the "nature and circumstances of the offense and the history and characteristics of the defendant," reflecting the seriousness of the offense, affording adequate deterrence, protecting the public, and providing necessary rehabilitation to the defendant. 18 U.S.C. § 3553(a)(1-2).

In *United States v. Booker*, 125 S.Ct. 738 (2005), the Supreme Court restored to sentencing judges the power to use discretion in determining appropriate sentences. "In the wake of *Booker*, therefore, the discretion of a sentencing court is no longer bound by the range prescribed by the sentencing guidelines. Nevertheless, a sentencing court is still required to 'consult [the] guidelines and take them into account when sentencing.'" *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005) (quoting *Booker*, 125 S.Ct. at 767). In light of *Booker*, "a district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines. Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in § 3553(a) before imposing the sentence." *Id.* (citation omitted).

B. **18 U.S.C. § 3553(a) Factors to Consider in Sentencing.**

   1. **Nature and Circumstances of the Offense.**

The charged conduct, along with the events of January 6, 2021, in general, had serious consequences, as reflected in the PSR and as generally known by the historical significance of that day. The sheer volume of cases brought by the Government speaks to the importance of January 6 from the Government's standpoint, both as a matter of criminal conduct and as it

5

intersects with the peaceful handover of power and the Constitutional structures that serve the country.

From Defendant's standpoint, January 6, 2021, was a significant date as he would have the opportunity to hear from President Trump and then lend his voice and presence in support of issues that he believed were important. Regardless of how the Government chooses to portray Mr. Brown, he showed up on January 6 to exercise his First Amendment right to voice concerns he had about the integrity of the election and the protection of Constitutional safeguards. Meaning, he did not arrive in Washington with weapons or plans of destruction or chaos—as some groups did. He arrived to speak out and bring attention to issues that he did not believe were receiving enough attention. This, in itself, should be encouraged and cheered, rather than derided and jeered.

Mr. Brown's actions went beyond his peaceful intent, however, when he chose to enter the tunnel as so many protestors were confronting law enforcement. As shown in the Government's evidence at trial, Mr. Brown first peeked into the tunnel with his phone in hand:



6

He did not enter armed for conflict. He entered curious, almost as a tourist. He should have seen this crowd and turned around—but his innocuous intent and purpose upon entering the tunnel is relevant in evaluating the nature and circumstances of the offense. He was there with an innocent purpose (peaceful protest) and entered the tunnel with innocent motive (misguided curiosity).

While in the tunnel Mr. Brown was criminally disorderly in participating with the crowd, refusing to leave immediately, and generally lending support—physical and mentally—to others who may have had less innocent intents. As shown in the Government's evidence, Mr. Brown briefly interacts with some of his co-defendants, whom he did not know, to pass a canister back and forth, and, accepting the Government's argument *arguendo*, attempting to deploy the cannister. While Defendant disagrees with the full extent of his participation as argued by the Government, he readily concedes that his actions have consequences that he must now face.

2. **History and Characteristics of the Defendant.**

These actions must be viewed in light of Mr. Brown's history and characteristics. Mr. Brown is 56 years old with no relevant criminal history. His life is marked by service and law-abiding commitment to his community. He is an Eagle Scout, he completed high school, and he attended classes at night—while working—to obtain his Bachelor of Science in Business Administration in 1999. PSR ¶ 90. He was employed most recently as a successful salesman, until the time of his initial arrest, at which point he was terminated. PSR ¶ 92.

More than these biographical data points, his family and friends speak lovingly of the family member and friend whom they miss. *See* Exhibit 1. His mother writes of what Mr. Brown has accomplished and what he means to her:

> Since I have known Jeff all his life, I would like to ask you to consider things I believe you should know about him.
>
> 1. Jeff has always worked for the betterment of himself and his community.
>
> 2. Jeff is an Eagle Scout and his final project was to build benches and tables for a local park.
>
> 3. Jeff put himself through college as his father and I were not able to afford it.
>
> 4. Jeff has been gainfully employed all of his adult life sometimes as an entrepreneur and sometimes working for others.
>
> 5. Jeff is a true friend to those he befriends and has kept in touch with them for many years. He is honest and faithful.
>
> 6. Jeff has helped me in so many ways. When his father and I divorced many years ago after 31 years of marriage he helped me through the rough spots by helping me around the house and with my car even though he was not living close to me.

And she pleads for the opportunity to see him again:

> He has been confined for over a year and a half and has suffered a lot. Additional confinement is not the solution. He needs to be returned to his friends and family that love him and want to help him get back to his future. I am more than willing to do anything you ask to have my son back. I miss him so much and since I am 80 years old may not have that much time left with him.

Exhibit 1.

His partner Kathy writes of Mr. Brown's love and dedication to her, but also to her mother and family. Her stories demonstrate that his care for others is part of his character, not simply transactional:

8

> I knew my mom was failing, so Jeff and I were trying to work through her "bucket list". She was fascinated with airplanes. Since Jeff is a flight instructor, he took us up on a private flight over her house. He had placed bright neon pink poster boards on her roof so she could tell which house was hers.
>
> I took my mom to the Ram's/Chargers game, as my mother was Aaron Roger's biggest fan! She dressed in her Aaron Rogers' jersey, complete with her cheese head. Jeff offered to drive us since my mother had difficultly getting around. On the way he stopped at Dicks Sporting Goods, he came out with a cane that also acted as a stool for my mom. He dropped us off at the gate and picked us up, after the game. It was one of her best days. Jeff is incredibly thoughtful and caring.

She continues, expressing her willingness to oversee his productive and healthy fold back into the community:

> Jeff has spent a over year in really challenging confinement. He has been transferred over 8 times and each time had to undergo Covid quarantine. He has remained cooperative and has been placed in "honor" pods as a Trustee in several of the facilities he has been in. He told me just yesterday that he has prepared over 90,000 meals during his incarceration.
>
> I believe he has more than learned from this experience, and I ask that additional confinement not be the solution, he needs to be back with his family and community. I ask that he be released with time served. As you are aware, Jeff has no prior criminal record.
>
> Your Honor, I truly believe Jeff feels a great deal of remorse for his decisions on that day. I can say with confidence, that he will not do anything of this nature again. Upon Jeff's release, he will be living with me in Orange County. I will be available to assist and support Jeff, by whatever means necessary, throughout the entire process and beyond. I will do my best to ensure he remains an upstanding member of the community and is not involved in anything similar.

Mr. Brown's friend of over 30 years writes of how they are like brothers. And he sheds light on the impulsive decision to travel for the protests:

> It breaks our hearts to see a great man in such turmoil. Jeff is a person who loves America and all Americans. He has always been a passionate man, and when the opportunity presented itself for Jeff to travel to support his political choice, he enthusiastically jumped at the chance. I remember how spontaneous his decision to go to D.C, January 6th was. It certainly was not on his calendar, and his decision to go was simply based on the inexpensive flights, allowing him to go last minute.
>
> Clearly this ordeal has gone from a moment of enthusiastic support of a political figure, to what could easily be described as an unforeseen nightmare for Jeff and many others in his shoes today. I am sure if Jeff could have conceived where he is today, he certainly would have gone left instead of right, and is surely regretting his choice to be in D.C that day. I promise you, Your Honor, Jeff is a good and faithful man and in my humble opinion, the world would be better served with him in our community, where he can continue to positively impact those lives around him. In addition, Jeff is a huge supporter of the men and women in blue. The last thing he would have ever wanted, is putting our peace officers in harms way, or be involved in an activity that would contradict his respect for them.

Another friend, of 20 years, describes Mr. Brown as a "solid and loyal friend":

> I am writing this letter to offer more insights of who Jeff is as a person. Jeff is someone I have always been able turn to for help and support. He was there for me through difficult times that I have had in my life, including my divorce. He was morally supportive and helped me figure out a plan of action, and actually helped me financially as well.
>
> While living in our neighborhood, we watched Jeff as he volunteered for a kitten foster group. He cared for the abandoned kittens, and found loving homes for many.
>
> Jeff is a solid and loyal friend. I trust him. I respectfully request Jeff be released with time served. I know he is remorseful for his actions.

His friend, Alice, writes of how Mr. Brown was there for her family when they were in need:

> His true colors came to light after my Aunt Margaret had her stroke. She spent about two months in a rehabilitation facility, the maximum allowed under her insurance. At that point, it was either send her to a nursing facility or find a way for her to return to her home. Jeff took the lead in making Margaret's return to her home possible - installing grab bars, stabilizing stair railings, moving furniture, hanging white boards so that she could keep track of her daily routine... all of which were instrumental in her recovery. We will forever be grateful for his expertise.

These are not friends writing out of ignorance; instead, they write out of compassion and grace for their friend:

10

> I realize that Jeff has been found guilty. I'm not in denial of his actions, nor is he. I truly believe the time he has already spent in prison has brought Jeff an alternative perspective to the January 6th events and his participation in them. If he knew then what he knows now I'm sure he would have done things a bit differently. Hindsight is always 20/20.

And all of these friends and family members express their willingness to assist upon his release:

> Jeff had a very special bond with our Mother. He was always doing things for her. Mom was an airplane fanatic. She loved to watch them fly overhead and was always wondering where they were going. One day Jeff surprised her by renting a plane, and taking her flying (with my sister)! He took her over the ocean (which she loved), and then over her house. Jeff had put a bright pink poster board in the backyard, so she could tell which house was her's! Our mother raved about that until the day she passed (at 92 years of age)! My sister made a picture book for her and she showed it to EVERYBODY! This adventure was just a few years before her passing. Jeff gave a beautiful speech at her "Celebration of Life"!
>
> My sister and I have dreams of Jeff coming home and being an asset to the communities around us! We could set up a program that would enable him to take elderly people on flights around the area. That would be so much more beneficial (community service) than him continuing to be confined! My feeling is that he needs to be back with his/our family, and we know he would do good things for the community!

During his incarceration, Mr. Brown has relied on these friends and family. He needs his family, and his family needs him. They are aware of the severity of this offense. This serves the needs of justice by protecting the community while fostering Mr. Brown's successful rehabilitation.

3. **The Need for the Sentence to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense.**

The nature and circumstances of the offense and of Mr. Brown must be balanced with imposing a sentence that reflects the seriousness of this offense, respects the rule of law, and provides a just punishment. Mr. Brown understands the seriousness of this charged conduct and, indeed, the entirety of what occurred on January 6, 2021. Innocent members of law enforcement were needlessly injured, multiple protestors died of various causes, and others were injured and scarred.

And notably, the cause for which Mr. Brown was there to support—further evaluation of the election results—was fatally harmed by the unprecedented assault on

the Capitol and the democratic process. The criminal actions of a few, undercut the political interest of many more.

Mr. Brown takes full responsibility for his actions and his role. He has spent every day since January 6 reliving that day, and he faces the constant reminder of his wrongdoing as he sits behind bars, removed from his family, his life, and his freedom.

As serious as Mr. Brown's actions were, they must be viewed in context when considering sentencing. Unlike others, Mr. Brown did not bring any weapons with him to the speech. Nor did he bring any items that suggested he anticipated what ended up occurring. He did not bring body armor or a helmet. He did not bring a radio or a gas mask. In fact, he did not even bring any political apparel.

While his lack of preparation or anticipation does not change what happened that day, it is important context. His specific conduct, for which he is remorseful, did contribute to the overall chaos, and certainly to the trauma of law enforcement who was present in the tunnel. But his actions contributed decidedly less than the actions of those who brought tear gas and weapons, than the actions of those who came with designs of destruction, and than those who repeatedly and unrepentantly assaulted, destroyed, and trespassed. This does not excuse Mr. Brown, but it is relevant context when evaluating the severity of his specific conduct.

    **4.**     **To Afford Adequate Deterrence to Criminal Conduct.**

Mr. Brown has been adequately deterred and is not likely to engage in future criminal conduct. He is certain to face consequences far beyond what he would have previously imagined. He was fired from his employment. He was smeared (whether right or wrong) by

every media publication.  His family and friends have suffered.  He has lost friends, become estranged from family members, and lost so much for which he has worked.

Following his arrest, he was released.  Upon the Government's request to the district judge, he was later returned to confinement.  He was then shuttled between facilities—from the District's Central Detention Facility, to the Central Treatment Facility, to Orangeville, Virginia, to Rappahannock, Virginia, to pre-trial release, to Northern Neck Regional Jail following trial, and back to the Central Treatment Facility most recently.  This has taken a toll mentally and physically; and it has made clear to Mr. Brown that he never wants to experience anything like this again.  Every day he serves is a day further from his mother, his partner, and his life of freedom.

This is Mr. Brown's only adult conviction and only felony.  It will follow him for the rest of his life and serve as a daily tattoo of unavoidable consequence.  He is deterred.

**5.     To Protect the Public from Further Crimes of the Defendant.**

Mr. Brown is not a danger to the community.  Further, Mr. Brown's conduct on January 6 is isolated to a unique set of circumstances that unfolded that are not likely to be replicated.  The individuals who participated in the Capitol riot were "called to Washington, DC, by an elected official, [and] prompted to walk to the Capitol by an elected official."  *United States v. John Lolos*, 1:21-cr-00243-APM (sentencing held on November 19, 2021).  People such as Mr. Brown were "a pawn in the game played by people who know better."  *Id.*  Without provocation from former leaders and a mob of thousands of people, Mr. Brown would not have conducted himself the way that he did.  He was used by others.  While he bears the responsibility for his actions, he should not bear the responsibility for others as well.

Even if the events of that day were to repeat themselves in some fashion, Mr. Brown would not be a part. He has been convicted and punished—even before the Court's sentencing—and he has lost so much of what he cares for in life. He is deterred and society is protected from Mr. Brown, for the reasons argued above and presented by his family and friends.

**6.     Unwarranted Sentencing Disparities.**

18 U.S.C. § 3553(a)(6) directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Due to the large number of January 6 cases, there are many cases available for comparison, all subject to unique facts and criminal histories. Nonetheless, comparison and consideration of these cases is helpful.

In a co-defendant's case, *United States v. Shelly Stallings*, Case No. 21-cr-178-4, this Court sentenced Ms. Stallings to 24 months' imprisonment. Unlike the instant case, Ms. Stallings pleaded guilty, and her case contains other mitigating factors. Her case is nonetheless relevant as she was charged with the same offenses and the same general conduct. This is the most relevant and informative case to compare with Mr. Brown's.

In *United States v. Daniel Caldwell,* Case No. 1:21-CR-00181-CKK, the court sentenced the defendant to 68 months' incarceration. In that case Mr. Caldwell armed himself with bear spray, wore protective glasses, and brought a hand-held radio for communication. He came prepared for a battle of some sort, and he was present on the front line of the assault for an extended period. Here, Mr. Brown entered the tunnel peacefully, taking videos with his cell phone.

In *United States v. Mazza*, No. 1:21-CR-00736-JEB, the defendant came to Washington with two loaded handguns. He entered the Capitol, assaulted law enforcement with a stolen

14

baton, remained on the Capitol grounds with a loaded firearm, and later filed a false police report. The court sentenced him to 60 months' incarceration. Here, Mr. Brown did not come to the Capitol with any weapon or any design of violence. He did not steal from law enforcement, and the assault he is claimed to have committed did not hit impact any identifiable victim. With no criminal record and complete compliance with all pretrial restrictions, Mr. Brown's culpability and need for punishment is less severe by any measure.

In *United States v. Palmer*, No. 1:21-CR-0328-TSC, the defendant assaulted law enforcement multiple times, through various instruments. He threw a plank like a spear, he sprayed law enforcement with a fire extinguisher and then threw the canister at law enforcement, he assaulted law enforcement with scaffolding, and he again tried to assault law enforcement with a cone. The court sentenced him to 63 months' incarceration. Here, accepting all of the Government's arguments *arguendo*, Mr. Brown attempted to spray a substance that law enforcement uses on unarmed citizens as a basic compliance technique. What's more, the Government's evidence indicates that he did not actually make contact with any identifiable victim. This is quantifiable less culpable than Mr. Palmer's acts.

And relevant to Defendant's specific request, there are multiple offenders who committed worse offenses, based on the nature and circumstances of the offense, and received 48 months or less from the Court. *See, e.g.*, *United States v. Bledsoe*, No. 1:21-CR-00204-BAH; *United States v. Decarlo*, No. 1:21-CR-00073-BAH; *United States v. Hale-Cusanelli*, No. 1:21-CR-00037-TNM; *United States v. Ochs*, No. 1:21-CR-00073-BAH; *United States v. Coffman*, No. 1:21-CR-00004-CKK; *United States v. Hughes*, No. 1:21-CR-000106-TJK; *United States v. Richardson*, No. 1:21-CR-00721-CKK; *United States v. Languerand*, No. 1:21-CR-00353-JDB; *United States*

15

*v. Fairlamb*, No. 1:21-CR-00120-RCL.  These are individuals who planned, assaulted, and acted violently and with malice.  They received between 41-48 months' incarceration.

In light of Ms. Stallings' sentence and these sentences throughout the district, any sentence above 40 months would create an unwarranted sentence disparity in light of Mr. Brown's acts and his history.

C.  **Downward Variance**.

A variance is appropriate due to the extraordinary circumstances of a man having his first significant encounter with law enforcement at the age of 58, after being beckoned to the Capitol by the then-sitting president.  Mr. Brown has otherwise been a lawful and contributing member of society.  Even since his arrest, he has been released twice, moved often, and respectful and obedient to the Court's direction throughout.  It is a unique set of circumstances that brings someone to this place in the criminal justice process at this point in their life.

To this point, the Government's argument throughout the prosecution of the January 6 cases is that they stand apart, unique in their nature.  The Government has repeated this argument frequently, related to discovery, speedy trial, joinder, and other important Constitutional issues.  For that uniqueness to be consistent, a rote allegiance to the sentencing guidelines—which neither considered nor planned for these facts—would be illogical.  These cases are either unique—as the Government has repeatedly represented to the Court—or they are not.  Defendant suggests that they are indeed unique, making the sentencing guidelines less informative than they would be otherwise.

The mandates of 18 U.S.C. § 3553(a), the unique facts and circumstances of this case, and the need to avoid unwarranted sentence disparity all militate in favor of a reasonable downward variance from the sentencing guidelines, which cannot properly capture these facts

and circumstances through a formula. For these reasons, Mr. Brown respectfully requests no more than 40 months' incarceration.

## Conclusion

For these reasons, Defendant respectfully requests a period of incarceration not to exceed 40 months, followed by conditions as appropriate and recommended by Probation.

Respectfully submitted,

Jeffrey Brown
By Counsel

\_\_/s/_____
Samuel C. Moore
D.C. Bar No. 1015060
Law Office of Samuel C. Moore, PLLC
526 King St., Suite 506
Alexandria, VA 22314
Email: scmoore@scmoorelaw.com
Phone: 703-535-7809
Fax: 571-223-5234
*Counsel for the Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of April, 2023, I electronically filed the foregoing with the Clerk of Court Using the CM/ECF system, which will then send a notification of such filing (NEF) to:

Cindy J. Cho
Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia
601 D Street NW
Washington, D.C. 20530
(317) 229-2425
Email: Cindy.Cho@usdoj.gov

Jocelyn Patricia Bond
U.S. Attorney's Office for the District of Columbia
555 Fourth Street, NW
Washington, DC 20001
(202) 252-2571
Email: jocelyn.bond@usdoj.gov

Stephen James Rancourt
DOJ-USAO
Northern District of Texas
1205 Texas Avenue, Suite 700
Lubbock, TX 79412
(806) 472-7351
Email: stephen.rancourt@usdoj.gov

                                                                            /s/
                                             Samuel C. Moore
                                             D.C. Bar No. 1015060
                                             Law Office of Samuel C. Moore, PLLC
                                             526 King St., Suite 506
                                             Alexandria, VA 22314
                                             Email: scmoore@scmoorelaw.com
                                             Phone: 703-535-7809
                                             Fax: 571-223-5234